# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
Assigned on Briefs July 24, 2018 at Knoxville

## JOSHUA L. CARTER v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2011-D-3013, 2011-B-1648   Mark J. Fishburn, Judge**

_____

### No. M2017-02401-CCA-R3-PC

_____

Joshua L. Carter, Petitioner, was convicted in separate jury trials of sale of less than .5 grams of cocaine in a drug-free zone; possession with the intent to sell or deliver more than .5 grams of cocaine in a drug-free zone; simple possession of marijuana; and evading arrest in case number 2011-B-1648 and of voluntary manslaughter, attempted especially aggravated robbery, and felony murder in case number 2011-D-3013. Petitioner received a total effective sentence of forty years as a multiple offender in case number 2011-B-1648 and received a life sentence in case number 2011-D-3013, to be served consecutively to his forty-year sentence. These cases were consolidated on appeal, and this court affirmed Petitioner's convictions. Petitioner filed petitions for post-conviction relief. The post-conviction court consolidated the petitions and denied relief. On appeal, Petitioner asserts that: (1) trial counsel in case number 2011-D-3013 failed to call an alibi witness; (2) trial counsel in case numbers 2011-B-1648 and 2011-D-3013 failed to properly investigate the cases; and (3) trial counsel in case number 2011-B-1648 failed to withdraw. After a thorough review of the facts and applicable case law, we affirm the post-conviction court's denial of relief.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and J. ROSS DYER, JJ., joined.

Joseph L. Morrissey, Nashville, Tennessee, for the appellant, Joshua L. Carter.

Herbert H. Slatery III, Attorney General and Reporter; Garrett D. Ward, Assistant Attorney General; Glenn R. Funk, District Attorney General; and Jan Norman, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## I. Factual and Procedural Background

This court set out the facts underlying case number 2011-B-1648 and in case number 2011-D-3013 on direct appeal as the following:

I. Facts Related to Case [2011-B-]1648

Metro Nashville Police Detective Jeremy Smith testified that on March 4, 2011, he was the undercover officer in a "buy-bust" narcotics operation. He explained that a "buy-bust" operation involves an undercover officer who purchases drugs, a "close-cover" team that surveils the situation for the officer's safety, and a "take-down" team that arrests the drug dealer after the purchase. The undercover officer would wear a listening device that transmitted audio to other members of the team but did not record audio. Detective Smith testified that for the March 4, 2011 operation, he was posing as a drug user. He approached Purvis Edwards in a tobacco store parking lot to ask for a lighter. Mr. Edwards entered Detective Smith's car, and Detective Smith asked Mr. Edwards whether he had a "twenty" or could get him a "twenty." Detective Smith explained that a "twenty" was $20 worth of crack cocaine. Mr. Edwards responded that he could take the detective to get the drugs but wanted to go to a Money Gram store first. Prior to going to the Money Gram store, Mr. Edwards called someone and told that person that he wanted two "twenties."

Detective Smith testified that he took Mr. Edwards to the Money Gram store, and when Mr. Edwards returned to Detective Smith's car, he made another telephone call, this time saying that he was on his way. Mr. Edwards directed Detective Smith to the Cee Bee Food Store on Lafayette Street and Charles E. Davis Boulevard. Detective Smith parked and gave Mr. Edwards two $5 bills and one $10 bill, all of which had been previously photocopied. Mr. Edwards walked towards the store and out of Detective Smith's sight. When Mr. Edwards returned to the car, he gave back to Detective Smith the $20, saying that he could not make the drug purchase "because the vice was out." Detective Smith explained that meant someone in the area had seen police officers. Mr. Edwards made another telephone call, again asking for two "twenties," as Detective Smith was driving away from Cee Bee Food Store. Mr. Edwards directed Detective Smith to return to the food store. Mr. Edwards took the previously-

photocopied money from Detective Smith and walked to the front corner of the store. Detective Smith testified that Mr. Edwards met a black male wearing a black, long-sleeved shirt and a "gray puffy-like . . . jacket with no sleeves." Detective Smith said that an obstruction prevented him from seeing their hands. The two men were together for approximately thirty seconds, and then Mr. Edwards returned to Detective Smith's car. Mr. Edwards showed Detective Smith several loose white rocks in his hand, which he then gave to the detective. Detective Smith testified that having a small amount of drugs loose and held in a hand rather than in a bag was typical because drug dealers would break off a piece of a larger rock of crack cocaine to give it to the buyer. When he had the drugs in his hand, Detective Smith gave a signal to other officers to begin the "take-down." He said that [Petitioner] ran towards the J.C. Napier housing project, where he was taken into custody.

Detective Smith testified that in connection with the buy-bust operation, the police collected a large rock of cocaine, several small rocks of cocaine, and marijuana separated into small bags. Detective Smith further testified that the police collected $215 in currency from [Petitioner], including the two $5 bills and the one $10 bill that Detective Smith had previously photographed and had given to Mr. Edwards.

On cross-examination, Detective Smith said that he did not remember testifying in a January 2012 proceeding that he saw [Petitioner] place something in Mr. Edwards' hand. He stated that the January statement was "true and correct" because it was closer to the date of the operation. Detective Smith agreed that he did not give a description of [Petitioner] to other officers and explained that other officers watching the scene would have given that description. Detective Smith testified that he did not see [Petitioner] throw anything on the ground before his arrest and did not see his arrest. He said that one would not find drugs just lying on the ground in that general area. Detective Smith could not remember whether Mr. Edwards, after being arrested, asked where the person was who had sold him the drugs.

On re-direct examination, Detective Smith clarified that he saw hand movements between [Petitioner] and Mr. Edwards but that he did not see the actual items being exchanged. Detective Smith testified that he was familiar with the area where the buy-bust operation had occurred and had conducted routine walking patrols around the J.C. Napier housing project. He had never seen drugs lying on the ground.

David Kline testified that he managed the mapping division at the Metro Nashville Planning Department and that as part of his duties he created 1,000 feet drug-free zones around certain properties. For purposes of [Petitioner]'s trial, he had created a map showing Cameron Middle School, the drug-free zone around the school, and Cee Bee Food Store. He testified that he was familiar with Cameron Middle School on a personal level because he tutored there twice weekly, including the time that the buy-bust operation occurred; therefore, he knew that the middle school was "an opening and functioning" public school.

Tennessee Bureau of Investigation ("TBI") Special Agent forensic scientist Cassandra Ann Franklin-Beavers testified that she weighed and tested the substances given to her in relation to this case. Two substances were cocaine base, also known as crack cocaine, one of which weighed 2.52 grams and the other 0.3 grams. The third substance was marijuana. While Agent Franklin-Beavers did not testify about the weight of the marijuana, her laboratory report, entered as an exhibit to the trial, indicated that the marijuana weighed 4.5 grams.

Purvis Lee Edwards, an indicted co-defendant in this case, testified that he had numerous prior convictions, including four misdemeanor theft convictions, two felony forgery convictions, two misdemeanor fraudulent use of a credit card convictions, and three possession of less than .5 grams of cocaine convictions. He said that the drug and theft convictions were related to his drug use. Mr. Edwards testified that in March 2011, he had been living in a hotel after being released from incarceration. On the day in question, his brother had sent him a Money Gram to help him pay for rent, but Mr. Edwards did not have a way to get to the Money Gram store to retrieve the money. He was walking to a nearby store when a white man in a vehicle, Detective Smith, stopped him to ask if he knew where to get "D," which Mr. Edwards explained meant "dope." Mr. Edwards responded affirmatively and asked for a ride to the Money Gram store. Detective Smith drove him to the Money Gram store and then back to Cee Bee Food Store. Mr. Edwards testified that he wanted to simply pay Detective Smith for the ride and leave but that the man reminded him about getting drugs. Mr. Edwards said that he walked around the block, returned to Detective Smith, and told him that there were no drugs because "vice was out." Mr. Edwards stated that he had not made a real effort to find any drugs at that point but that he reconsidered when Detective Smith pointed out that he would have already gotten the drugs he wanted if he had not taken Mr.

Edwards to the Money Gram store. Mr. Edwards testified that he then made a concerted effort to find drugs, so he called several people, including [Petitioner]. When he asked [Petitioner] if he was in the area, [Petitioner] responded that he was "right here." Mr. Edwards testified that he met [Petitioner] in front of the check cashing store directly next to Cee Bee Food Store and that they walked together to the front of Cee Bee Food Store. Mr. Edwards said that he asked [Petitioner] for two "dimes," or two $10 pieces of crack cocaine. Mr. Edwards testified that he and [Petitioner] exchanged money for the drugs and that he returned to Detective Smith's vehicle. He gave Detective Smith all of the cocaine and was subsequently arrested.

Mr. Edwards testified that the Thursday before [Petitioner]'s trial began, the two men were in a holding cell awaiting a court date when [Petitioner] told Mr. Edwards that he wanted him to give [Petitioner]'s attorney a version of events with which Mr. Edwards disagreed. Mr. Edwards said that [Petitioner] wrote down that he wanted Mr. Edwards to say that he had given [Petitioner] the "marked" money in exchange for a $20 bill and that Detective Smith had been parked on the side of the building where he could not have seen their transaction. Mr. Edwards said that he recalled Detective Smith being parked directly behind the men.

On cross-examination, Mr. Edwards testified that [Petitioner] had written down the information for him; however, Mr. Edwards tore up the paper and flushed it down a toilet. He said that he had a change of heart and did not want to start a new life with a lie. Mr. Edwards agreed that he gave [Petitioner] money and that [Petitioner] gave him drugs. Mr. Edwards also confirmed that when both men were arrested, he asked the police officers where the man was who had sold him the drugs and said that [Petitioner] was not the man. Mr. Edwards stated that he was lying when he said that to the police and that he "was actually laying a foundation for [Petitioner] to build upon later because he was [Mr. Edwards'] drug dealer at that time."

Metro Nashville Police Detective Marcel Chalou testified that on March 4, 2011, he was providing "close cover" for Detective Smith in the buy-bust operation, meaning that he was in an unmarked car close to Detective Smith. Detective Chalou said that he was parked in the Cee Bee Food Store parking lot and watched Mr. Edwards approach [Petitioner]. He testified that he saw a "hand-to-hand transaction" and described exactly what he observed: "I s[aw] Mr. Edwards, his hands go as if he's passing

something to [Petitioner], then I s[aw] them, they're looking down, I s[aw] Mr. Edwards' hand is out flat and [Petitioner], what I [saw] [wa]s him placing something in Mr. Edwards' hands." Detective Chalou said that he relayed [Petitioner]'s description to the rest of the team—"short male black, blue jeans, black shirt, gray puffy vest." After both [Petitioner] and Mr. Edwards were taken into custody, Detective Chalou looked at both of their telephones and saw that Mr. Edwards had called [Petitioner].

On cross-examination, Detective Chalou testified that he followed [Petitioner] across Lafayette Street into the J.C. Napier housing project but that he turned right instead of following directly behind [Petitioner] in an attempt to intercept him. Detective Chalou said that he did not see [Petitioner] discard anything. Detective Chalou further said that he had seen drugs on the ground in that neighborhood but that there was "[g]enerally . . . a reason why." He stated that he had never "just randomly come up, been walking down the street and found [a] bag of drugs." Detective Chalou could not recall citizens being in the immediate area of [Petitioner]'s arrest but believed that some people were around the buildings nearby.

Metro Nashville Police Detective Steven Jenkins testified that he was on the "take-down" team involved in the March 4, 2011 buy-bust operation that resulted in [Petitioner]'s arrest. He said that in his experience, he had learned that oftentimes suspects would try to hide from police in the housing projects. On March 4, he tried to position himself and his partner, Detective Robert Young, for the likelihood of a foot pursuit. He recalled hearing Detective Chalou's description of [Petitioner] over the radio. After receiving the description, Detective Young exited their vehicle in an attempt to cut off [Petitioner]. Detective Jenkins said that he parked the car and followed Detective Young. He saw [Petitioner] running down a hill.

Detective Young first encountered [Petitioner], and [Petitioner] attempted to reverse course. Detective Jenkins chased after him, and he saw [Petitioner] throw a baggy. The baggy hit a brick wall and fell to the ground. Detective Jenkins said that he was only three to four feet away from [Petitioner] at that point and then took him into custody. Detective Young recovered the bag soon thereafter. Detective Jenkins testified that after he was arrested, [Petitioner] made a statement that he knew he should not have been selling because he had seen "the white girl," which Detective

- 6 -

Jenkins interpreted to mean Detective Dills, a female detective on the take-down team that day.

Detective Young corroborated Detective Jenkins' testimony. He added that the bag discarded by [Petitioner] contained crack cocaine and marijuana. Detective Young searched [Petitioner] and found over $200 in currency. Detective Young said that he was carrying a photocopy of the buy money used in the operation and was able to confirm on the scene that [Petitioner]'s currency included the bills used as buy money. On cross-examination, Detective Young stated that he believed he and Detective Jenkins exited the car at the same time. He was not sure whether [Petitioner] had retrieved the bag from a pocket or whether it had been in his hand.

After Detective Young's testimony, the State rested its case-in-chief. Thereafter, [Petitioner] moved for a judgment of acquittal on all counts. The trial court granted the judgment of acquittal for the drug paraphernalia count after the State conceded it had not presented proof to support that charge. The trial court otherwise denied [Petitioner]'s motion. [Petitioner] did not put on any proof. Subsequently, the jury convicted [Petitioner] of the sale of less than .5 grams of cocaine in a drug-free zone, a Class B felony; possession with the intent to sell or deliver more than .5 grams of cocaine in a drug-free zone, a Class A felony; simple possession of marijuana, a Class A misdemeanor; and evading arrest, a Class A misdemeanor. The trial court found that [Petitioner] was a Range II, multiple offender. It sentenced him to concurrent terms of forty years (twenty-year mandatory minimum to serve) for the Class A felony; twenty years (twelve-year mandatory minimum to serve) for the Class B felony; and eleven months, twenty-nine days for each Class A misdemeanor.

. . . .

III. Facts Related to Case [2011-D-]3013

Metro Nashville Police Officer Zachary Grunow testified that on May 6, 2011, he responded to a shooting on Murfreesboro Road, specifically in a parking lot of a law firm that was across the street from the Out of Bounds Sports Bar. Officer Grunow said that the victim was already deceased when he arrived and that the victim was lying between two vehicles, a green Honda and a white Pontiac. Officer Grunow stated that

the officers on the scene were securing the scene and interviewing witnesses. For his part, he conducted a preliminary interview of Jay Artis.

On cross-examination, Officer Grunow testified that he arrived at the scene between 2:00 and 3:00 a.m. He said that the parking lot was lit by street lights but did not know whether the police had provided additional lighting by the time a photograph of the scene was taken. Officer Grunow testified that Mr. Artis gave him a description of the suspects and that his report reflected that the description of one suspect was "a male black approximately 5'7["], wearing a white T-shirt with writing on it." The second suspect was described as "a male black approximately 5'9["][,] wearing a plain black T-shirt and a light blue hat."

Jay Artis testified that on May 5, 2011, he and the victim, Jordan Gardner, whom he had known for approximately one year, went to Out of Bounds. Before they went to the club, they each obtained a one hundred dollar bill that they wrapped around several one dollar bills, to make it seem as if they had more money than they did. At the club, they sat in a booth with two women. While he could not remember the name of either, it is clear from other testimony that one of the women was Pamela Jenkins, an indicted codefendant in this case. Mr. Artis recalled that he and the victim stayed together all night but that Ms. Jenkins came and went. He remembered that she made several telephone calls, but he said that he never heard her telephone conversations. Mr. Artis testified that he and the victim flashed their rolls of money at times. At closing time, the victim left the club with Ms. Jenkins, and Mr. Artis followed them. Mr. Artis said that the victim told him there was a woman outside for Mr. Artis to meet. Ms. Jenkins told Mr. Artis that the woman was her sister, and other testimony reveals that the woman was Jessica Rucker. Mr. Artis entered Ms. Rucker's car, and she drove across the street to the lot where Mr. Artis and the victim had parked. Ms. Jenkins and the victim walked to the lot. Mr. Artis testified that the victim and Ms. Jenkins were talking outside of Ms. Rucker's car, and he was talking to Ms. Rucker inside her car. He said that he then saw the victim struggling with a man. The victim and the man moved to the back of the car during their struggle, and Mr. Artis opened the door to get out and help the victim. He testified that the victim managed to push the man away but that the man drew a gun and shot the victim twice. Mr. Artis described the shooter as short and as having facial hair. At that point, Mr. Artis said that he saw a second man behind the shooter wearing a light blue cap. Mr. Artis said that later, the police showed him several sets of photographs. He identified both the shooter and the second man in those

photographs.  For the shooter, Mr. Artis said that he was one hundred percent sure of his identification in the photograph array, and he also identified [Petitioner] from the witness stand as the shooter.  For the second man, Mr. Artis said that he was eighty percent sure of his identification in the photograph array, and Mr. Artis identified appellant McLemore in the courtroom as the second man involved in the shooting.  Mr. Artis identified the photograph array that the police showed to him and on which he had circled the fifth photograph.  He had also written on the array, "Number 5 is the shooter 100%."  Mr. Artis also identified a second photograph array on which he had circled the first photograph and written, "I feel 80% sure he was behind the shooter."

On cross-examination, Mr. Artis testified that the second person never said anything.  He agreed that it was possible the second person was not involved.  He said that both the shooter and the second person ran behind a building after the victim was shot.  Mr. Artis testified that the second person was 5' 10" or 5'11".  He said that the shooter's facial hair was a thin beard.

Metro Nashville Police Detective Johnny Ray Crumby, Jr., testified that he responded to the scene of the shooting on May 6, 2011.  While at the scene, he was notified that the police had stopped a black male in a white vehicle because a security guard had reported seeing a white vehicle leaving the area of the shooting at a rapid speed.  Detective Crumby talked to the driver of the white vehicle who reported that he had driven away so quickly because he heard the shooting and was scared.  Detective Crumby also had Mr. Artis view the driver to determine whether he was involved, and Mr. Artis said that he was not.  Detective Crumby testified that he assisted Detective Andrew Injaychock in interviewing Mr. Artis at the police station.  Mr. Artis reported to them that the shooter was 5'6" or 5'7" and that the second man was 5'1" or 5'11".  Detective Crumby testified that during the investigation, he obtained [Petitioner]'s cellular telephone records and looked at the numbers he called around the time of the shooting.  He also received a lead that a man named Shawn was involved, so he began dialing numbers listed in [Petitioner]'s records to determine whether any of those numbers belonged to Shawn.  When he successfully connected to appellant McLemore, he arranged to meet with him.  He confirmed that the number listed in [Petitioner]'s telephone belonged to appellant McLemore.

Jessica Rucker testified that Pamela Jenkins was her cousin. In May 2011, Ms. Jenkins and her children lived with Ms. Rucker. Ms. Rucker recalled that she had been concerned at the time that Ms. Jenkins was abusing prescription pain medication. Ms. Rucker testified that on May 5, 2011, she dropped Ms. Jenkins off at a store so that Ms. Jenkins could go to a club with a friend. She then picked up Ms. Jenkins' child from her mother's house and gave a ride to a friend called "Boo-Master" and his girlfriend. Ms. Rucker said that Ms. Jenkins called her from the club and told her about a man there with a lot of money. Ms. Rucker said that the man was the victim. Ms. Jenkins asked Ms. Rucker to call Boo-Master about coming to the club. Ms. Rucker testified that she interpreted the conversation to mean that Ms. Jenkins wanted Boo-Master to come to the club to rob the man. Ms. Rucker stated that she was unable to contact Boo-Master. She said that Ms. Jenkins called her again close to the club's closing time so that Ms. Rucker could pick her up. Ms. Rucker testified that she was driving Ms. Jenkins' white Pontiac Grand Prix. Ms. Rucker went to the club, and Ms. Jenkins exited the club with two men, one of whom was the victim. Ms. Jenkins said that she did not know their names. One man got into the car with her while the other one walked across the street with Ms. Jenkins. Ms. Rucker said that she drove over to the lot across the street because that was where she was told to park. She stated that she had no intention of "hanging out" with the two men, but one of them kept asking whether she was hungry, as in whether she wanted to eat somewhere. Ms. Rucker said that the "robbery thing" happened then. She testified that she saw a man in all black fighting with the victim, who was fighting back. She said that she exited the car, heard gunshots, and ran to a nearby restaurant. Ms. Rucker recalled that the man wearing all black said, "'Don't you owe me something,'" when he walked up to the car.

Ms. Rucker testified that while she ran across the street, Ms. Jenkins remained by the building at which they had parked. She recalled Ms. Jenkins screaming during the attack but stated that afterwards, Ms. Jenkins "really didn't want to talk about it . . . it's like it wasn't affecting her like it was affecting me." Eventually, a friend took Ms. Jenkins and Ms. Rucker home. Later, the police came to their home and took Ms. Jenkins to the police station. A couple of days later, she was stopped by the police on the interstate highway. Ms. Jenkins and Ms. Rucker's sister were also in the vehicle. They all went to the police precinct to speak with the police. She testified that she told the police the same thing she had told the jury.

On cross-examination, Ms. Rucker testified that she did not know Boo-Master's real name and that she had known him for several years. At the time of the shooting, Boo-Master was not working. Ms. Rucker said that Ms. Jenkins asked her to call Boo-Master and asked her to tell Boo-Master to call Ms. Jenkins. She said that she did not see the person who shot the victim exit a car and did not see where he went afterwards. Ms. Rucker denied ever telling Ms. Jenkins not to talk to the police.

Metro Nashville Police Officer Rhonda Evans testified that she was an officer with the identification section and that she helped process the crime scene connected to this case. Officer Evans stated that she photographed the scene using both the flash on her camera and "natural light." She explained that the flash allowed her camera to record the necessary details of the scene but that the natural light captured the lighting as it actually appeared without assistance of the flash. The natural light photographs were admitted into evidence as collective exhibit seven, and the flash photographs were admitted into evidence as collective exhibit eight. Officer Evans and another crime scene technician processed various items collected around the crime scene, the two vehicles that were next to the victim's body, and an area of Out of Bounds for fingerprints. She explained that she processed the area at Out of Bounds because the police had information that parties involved in the shooting had been at the club. Officer Evans testified that a projectile was found and collected at the scene. Metro Nashville Police Officer Sharon Tilley, also with the identification section, corroborated Officer Evans' testimony. In addition, Officer Tilley photographed the victim's body during the autopsy and photographed the contents of the victim's pockets. The victim had ten one-dollar bills but no one-hundred dollar bills.

Pamela Jenkins testified that she had been indicted in the instant case. She said that she had not received any kind of deal in exchange for her testimony. Ms. Jenkins testified that she went to Out of Bounds with a friend named Chris on May 5, 2011. She met Jay Artis and the victim on the dance floor and then sat with them in a booth until closing time. She recalled that they were both throwing money around while on the dance floor and that she warned them about getting robbed. She said that the men had a verbal argument with someone in the club but that they "squashed" the argument by apologizing. Ms. Jenkins testified that [Petitioner] was also in the club that evening, wearing an orange shirt. Ms. Jenkins authenticated several photographs taken inside Out of Bounds that night by a promotion company. In the photographs, she identified herself, sitting in

a booth, and [Petitioner], standing in the background of the photographs. In the photographs, [Petitioner] was wearing a short-sleeved, orange shirt over a long-sleeved, light-colored shirt.

Ms. Jenkins further testified that she called her cousin Jessica Rucker and asked her to contact Boo-Master. She explained that she wanted Boo-Master to come to the club to rob Mr. Artis and the victim. However, she never spoke with Boo-Master that night nor did she see him. She said that the next time she talked to Ms. Rucker, she asked Ms. Rucker to pick her up at the club. Ms. Jenkins testified that she was not expecting Boo-Master to accompany Ms. Rucker because she had already talked to [Petitioner] about robbing the victim and Mr. Artis. She stated that she told [Petitioner] that the two men had a lot of money. He said that he would rob them and instructed her to get the men outside of the club. Ms. Jenkins testified that she left the club with the two men and that Mr. Artis got into the car with Ms. Rucker. Ms. Rucker drove across the street, and Ms. Jenkins walked across the street with the victim to where his car was parked. She said that she and the victim were talking to Ms. Rucker when [Petitioner] and [appellant] McLemore "came out of nowhere." She testified, "[Petitioner] had a gun on [the victim], and [appellant McLemore] was wrestling with [Mr. Artis], and next thing I know they got to scuffling over the gun[,] and the gun went off three times[,] and we took off." Ms. Jenkins recalled hearing [Petitioner] say, "'[G]ive me what you owe me.'" She said that the appellants got into a black car after the shooting.

Ms. Jenkins testified that immediately after the shooting, she called [Petitioner], but he did not answer his telephone. The next time she talked to him, he asked her to meet him "out south," which she clarified as meaning a specific housing project. He told her that he did not want to talk over the telephone. Ms. Jenkins said that she spoke with the police that day, May 6, but did not tell them who had robbed the victim. She stated that she did not tell the truth because she was scared of the appellants. The next day, she met [Petitioner]. Upon her request, he had a person drive her to her car. Ms. Jenkins said that [Petitioner] instructed the person "to bring [Ms. Jenkins] back to him." When she got her car, she returned to [Petitioner]'s location at a housing project. Appellant McLemore was also present. Ms. Jenkins said that she asked [Petitioner] why he had shot the victim. He did not answer her. She also asked whether he had gotten any money from the victim, and he told her he did not. Ms. Jenkins testified that [Petitioner] told her not to talk to anyone and threatened to shoot up her mother's house. However, the police stopped her on the interstate

sometime later and took her in to the precinct. She said that she told the police then that [Petitioner] and [appellant] McLemore were responsible for the robbery. Ms. Jenkins admitted that she had misdemeanor convictions for shoplifting and attempted false report.

On cross-examination, Ms. Jenkins testified that she told the police that the person with whom the victim and Mr. Artis argued in the club was wearing a white shirt and blue hat. She denied that the person with whom they argued was Boo-Master. She said she had grown up with Boo-Master, and she agreed that he robbed people. Ms. Jenkins said that she only tried to call Boo-Master once that evening and that Ms. Rucker placed the call using the three-way function on her telephone. Ms. Jenkins testified that [Petitioner] was her height—5'3". She said that when he shot the victim, he was wearing the same thing he had been wearing in the club, and she affirmed that he had been wearing an orange shirt. Ms. Jenkins denied telling the police that the robbers exited a black Monte Carlo. She said that when she was standing across the street after the shooting, she saw them leave the area in a black Monte Carlo. Ms. Jenkins confirmed that she saw appellant McLemore "scuffling" with Mr. Artis. She also confirmed that Ms. Rucker told her not to talk to anyone about the event. Ms. Jenkins did not remember giving an interview to an officer at the crime scene after the shooting. She agreed that in her initial interview with detectives, she told them that she did not know either man involved in the shooting and could not describe them. She recalled telling the police that the victim had said he had a "Chopper" in the trunk of his car. She did not remember telling the police that the victim had grabbed her throat and threatened her. Ms. Jenkins agreed that [Petitioner] had not yet threatened her when she gave her initial interview. Ms. Jenkins agreed that [Petitioner] did not have any facial hair. She confirmed that she heard three shots that night.

. . . .

Metro Nashville Police Sergeant Andrew Injaychock testified that he was a homicide detective at the time of the May 6, 2011 shooting of the victim and that he was the lead investigator for the case. He responded to the scene within a short time of the shooting. Sergeant Injaychock described the area as being neither dimly lit nor well-lit. He testified that one of the first things the investigators did was to interview the driver of a white vehicle that had been seen leaving the area of the shooting, Joshua Martin. Sergeant Injaychock said that Mr. Artis, in a "show-up"

- 13 -

identification, stated that Mr. Martin did not participate in the robbery/shooting.

Sergeant Injaychock testified that he had Detective Ball locate and interview Pamela Jenkins, explaining that Ms. Jenkins had left the crime scene. Sergeant Injaychock said that he obtained surveillance video from inside Out of Bounds but that the quality of the video was poor and did not show the club exits. There was no surveillance video outside the club, and the law firm next to which the shooting occurred did not have a functioning surveillance camera. Sergeant Injaychock also obtained still photographs taken inside the club. After completing their survey of the crime scene, Sergeant Injaychock and Detective Crumby interviewed Mr. Artis at the police precinct.

Sergeant Injaychock said that he focused more on Ms. Jenkins after interviewing Mr. Artis because she had not been honest in her interview with Detective Ball. Sergeant Injaychock interviewed Ms. Jenkins again on the Sunday following the shooting. Ms. Jenkins told him that she had been with the victim and Mr. Artis in the club and that they had been "flashing" money. She tried to call someone about robbing the victim and Mr. Artis. When she was unsuccessful, she talked to [Petitioner], whom she said she had known since elementary school. Ms. Jenkins also told Sergeant Injaychock that "Boxhead Shawn" and [Petitioner] were responsible for what happened in the parking lot. Thereafter, Sergeant Injaychock showed a photograph array to Mr. Artis, and he identified [Petitioner] as the shooter. Sergeant Injaychock also showed Mr. Artis a photograph array that included the person Ms. Jenkins had originally tried to contact about the robbery, Cornell Bradley, also known as Boo-Master. Mr. Artis did not make an identification from that array.

Sergeant Injaychock testified that to identify "Boxhead Shawn," the police "cold-called" numbers listed in [Petitioner]'s telephone records until someone answered that he was "Shawn." The person agreed to an interview, and subsequently, the police learned that his real name was Adonis McLemore. Sergeant Injaychock testified that he asked appellant McLemore whether he went by the nickname "Boxhead Shawn," and appellant McLemore agreed that he did. He also said that few people knew that nickname. Sergeant Injaychock later showed Mr. Artis a photograph array that included appellant McLemore's photograph. Mr. Artis identified appellant McLemore as the second person involved but stated that he was only eighty percent sure. The police also showed Ms. Jenkins a photograph

- 14 -

array including appellant McLemore's photograph, and she identified his photograph as "Boxhead Shawn." Sergeant Injaychock testified that he had obtained the cellular telephone records of Jessica Rucker, Pamela Jenkins, [Petitioner], and appellant McLemore. After learning that [Petitioner] called Joshua Martin, the man who had been driving the white car after the shooting, Sergeant Injaychock interviewed Mr. Martin again and also showed Mr. Artis a photograph array including Mr. Martin. Thereafter, he eliminated Mr. Martin as a suspect.

Sergeant Injaychock next testified about the information he gleaned from the cellular telephone records collected in this case. As a point of reference, he testified that the 9-1-1 call reporting the shooting occurred at 2:38:35 a.m. The records of Ms. Jenkins and Ms. Rucker reflect many calls back and forth in the early morning hours of May 6. [Petitioner] and [appellant] McLemore had six telephone exchanges between 2:04 a.m. and 2:15 a.m. Sergeant Injaychock did not testify about the cellular tower to which [Petitioner]'s telephone connected during those calls; however, he testified that appellant McLemore's telephone connected to Sprint Tower 1479, 3.79 miles from the crime scene, at 2:04 a.m. From 2:05 a.m. until 2:10 a.m., appellant McLemore's telephone used Sprint Tower 1387, 3.29 miles from the crime scene. At 2:15 a.m., appellant McLemore's telephone used Sprint Tower 1389, 1.5 miles from the crime scene. Maps showing the locations of the towers were shown to the jury. Appellant McLemore did not use his telephone again until 2:46 a.m. Ms. Jenkins first called [Petitioner] at 2:16 a.m. During that call, her cellular telephone used Cricket Tower 147, 0.17 miles from the crime scene. [Petitioner]'s telephone used Cricket Tower 51, 1.78 miles from the crime scene. [Petitioner] and Ms. Jenkins exchanged calls at 2:25 a.m., 2:32 a.m., and 2:33 a.m., and for all three calls, [Petitioner]'s and Ms. Jenkins' telephones were using Cricket Tower 147. At 2:38 a.m., [Petitioner] called Ms. Jenkins. His telephone connected to Cricket Tower 51, 1.78 miles from the crime scene. At 2:48, he called Ms. Jenkins again, and this time his telephone connected to Cricket Tower 50, 3.25 miles from the crime scene.

Sergeant Injaychock testified that the records also reflected calls between Ms. Jenkins and [Petitioner] and between [Petitioner] and appellant McLemore later in the day on May 6. Also on May 6, [Petitioner] called a number that he later called again from jail. The call from jail was recorded, and the recording was played for the jury. In it, [Petitioner] discussed with an unidentified woman about how the woman had given a ride to Ms. Jenkins on May 6.

- 15 -

He also suggested to the woman that she contact a private investigator already working on [Petitioner]'s case to say that Ms. Jenkins had told her how tall the shooter was, which both [Petitioner] and the unidentified woman agreed was taller than [Petitioner]'s height. Sergeant Injaychock testified that according to his driver's license, [Petitioner] was 5'5".

On cross-examination, Sergeant Injaychock agreed that cellular telephone records could only show the location of the tower that a telephone used, not the exact location of the telephone. He also agreed that people had been celebrating Cinco de Mayo on May 5 and that the bars in Nashville closed between 2:00 a.m. and 3:00 a.m. Sergeant Injaychock said that the victim did not have a wallet nor did he have the roll of money with which he had been seen earlier in the day. He agreed that it was possible that the victim had literally thrown away his money while on the dance floor in the club.

Following Sergeant Injaychock's testimony, the State closed its case-in-chief. [Petitioner] and [appellant] McLemore did not present any proof. Subsequently, the jury convicted [Petitioner] of the lesser-included offense of voluntary manslaughter, the lesser-included offense of attempted especially aggravated robbery, and felony murder. The trial court merged [Petitioner]'s voluntary manslaughter conviction into his felony murder conviction. The court sentenced [Petitioner] as a Range II, multiple offender to twenty years for the attempted especially aggravated robbery conviction, concurrent with his life sentence for felony murder. The trial court ordered that his effective life sentence be served consecutively to his sentences in Case 1648.

*State v. Joshua L. Carter and Adonis Lashawn McLemore*, No. M2014-00767-CCA-R3-CD, 2015 WL 3929635, at *3-12, 16-31 (Tenn. Crim. App. June 26, 2015) (internal footnotes omitted) (some alterations in original), *perm. app. denied* (Tenn. Oct. 15, 2015). This court affirmed the judgments of the trial court in both of Petitioner's cases. *Id.* at *1. The Tennessee Supreme Court denied further review.

### Post-conviction proceedings

Petitioner filed timely petitions for post-conviction relief in both case number 2011-B-1648 and 2011-D-3013. The post-conviction court consolidated the petitions and ordered a bifurcated evidentiary hearing.

Petitioner testified that trial counsel met with him approximately six times for this case. He asked trial counsel to file a motion to suppress Detective Smith's testimony that Detective Smith looked at co-defendant Edwards' phone and saw that co-defendant Edwards had called Petitioner and that Detective Smith observed Petitioner hand drugs to co-defendant Edwards. Petitioner agreed that, at trial, trial counsel introduced photographs of the offense location that depicted a wall which would have allegedly blocked Detective Smith's view of the offense. Petitioner asserted that he was prejudiced by trial counsel's failure to file a motion to suppress Detective Smith's testimony that Detective Smith looked at co-defendant Edwards' phone and saw that co-defendant Edwards had called Petitioner because Petitioner did not receive a call from co-defendant Edwards. Petitioner testified that, on the day of trial, he learned that the State sought to introduce statements in which Petitioner allegedly threatened co-defendant Edwards.[1] Petitioner asserted that he was unaware that co-defendant Edwards would testify against him until the trial began. Petitioner asked trial counsel to request a continuance so that he and trial counsel could prepare to cross-examine co-defendant Edwards. However, trial counsel did not file a motion to continue the trial.

Petitioner also alleged that trial counsel "breezed through" the discovery when he visited Petitioner and did not properly investigate the case. Petitioner acknowledged that trial counsel photographed the crime scene and stated that trial counsel did not actually observe the buy money involved in this case. When the State offered a photocopy of the buy money into evidence at trial, Petitioner asked trial counsel to challenge the admission of the photocopy, but trial counsel did not. Petitioner also testified that trial counsel should have hired an expert to rebut the State's theory that the drugs found on the ground were Petitioner's. Petitioner asserted that the area where the offenses were committed was a high-crime area, so it would not have been unusual for drugs to be on the ground.

On cross-examination, Petitioner asserted the serial numbers on the buy money were not visible in the photocopy of the buy money. Petitioner believed that, if trial counsel had observed the actual buy money, he could have asserted at trial that the buy money was actually unmarked bills. Petitioner asserted that a motion to suppress Detective Smith's testimony that co-defendant Edwards' phone had called Petitioner's phone would have been successful because Detective Smith "lied under oath" about his observation of a hand-to-hand transaction between Petitioner and co-defendant Edwards.

---

[1] As noted in this court's opinion in Petitioner's direct appeal, co-defendant Edwards testified at trial that on "the Thursday before [Petitioner]'s trial began, the two men were in a holding cell awaiting a court date when [Petitioner] told Mr. Edwards that he wanted him to give [Petitioner]'s attorney a version of events with which Mr. Edwards disagreed." *Id.* at *8.

On redirect examination, Petitioner asserted that he did not threaten co-defendant Edwards in the holding cell before trial and, thus, was not aware of the possibility that co-defendant Edwards would testify at trial. Petitioner testified that, if the trial court had granted a continuance, he would have been able to give trial counsel his version of what occurred in the holding cell. Petitioner noted that the letter that he allegedly gave to co-defendant Edwards was never introduced into evidence at his trial. On recross-examination, Petitioner stated that he asked trial counsel to withdraw from representing him at his arraignment. He asked trial counsel to withdraw again when trial counsel was appointed to represent him in case number 2011-D-3013. Petitioner testified that he filed numerous complaints against trial counsel with the Board of Professional Responsibility and the Consumer Assistance Program. The basis of Petitioner's complaints was that trial counsel informed him that he "would do a certain amount of time" if Petitioner pled guilty to a prior drug charge, but Petitioner asserted that the case was not resolved the way that trial counsel advised.

Trial counsel testified that he had practiced law for over twenty years and that the majority of his practice was criminal defense work. Trial counsel had represented Petitioner prior to his representation in the current cases. He testified that he had no issues with Petitioner during his prior representation. During his representation of Petitioner in the current cases, he met with Petitioner numerous times. Trial counsel stated that he conducted "a very thorough investigation of the drug case." Trial counsel visited the crime scene and photographed the area. He also discussed the discovery with Petitioner. Trial counsel recalled that Petitioner informed him that the law enforcement officer who allegedly observed a hand-to-hand transaction between Petitioner and co-defendant Edwards could not have observed their interaction through a wall. However, during trial counsel's cross-examination of the officer, the officer testified that he clearly observed the transaction. Thus, trial counsel did not believe that hiring an expert to take photographs of the crime scene would have been beneficial to Petitioner's case.

Trial counsel stated that, either on the morning of trial or a few days before trial, the State informed him that Petitioner "had made some threatening remarks" to co-defendant Edwards in writing. On the morning of trial, co-defendant Edwards was not sitting at the counsel table with trial counsel and Petitioner, so trial counsel informed Petitioner that co-defendant Edwards might testify for the State. Trial counsel explained that he had previously discussed with Petitioner the possibility that co-defendant Edwards might become a State witness. Trial counsel stated that he did not ask the trial court for a continuance after learning that co-defendant Edwards was going to testify for the State because he "[d]idn't see any reason for one."

Trial counsel testified that the State offered a global plea to resolve both cases with Petitioner receiving a sentence of forty years. Petitioner rejected this offer. Trial

counsel stated that he discussed possible defenses and strategies on how to "approach the witnesses" with Petitioner. Trial counsel's strategy was to "cross-examine the detective who [Petitioner] claimed was giving testimony about something that he could not possibly have envisioned" and to discuss "the fact that it was a high crime rate area." Trial counsel testified that he:

> cross-examined the police officer about it being a high crime area, th[e] fact there are drug deals all over happening all the time, and he said, "Well, no, I've never just been walking around over there and found a bag of dope on the ground," he said "I do find some paraphernalia from time to time, I've never just found a bag of dope laying around."

Trial counsel explained that he did not file a motion to suppress Detective Smith's statement about co-defendant Edwards' phone calling Petitioner's phone because he did not have any legal basis for suppression. Trial counsel did not recall that Petitioner asked him to withdraw from either case. He stated that it was his practice to file a motion to withdraw if a client was unhappy with his representation and that he did not file a motion to withdraw in either of the current cases.

On cross-examination, trial counsel stated that he "probably" investigated co-defendant Edwards' criminal history. Trial counsel admitted that he did not investigate whether any other inmate observed the letter that Petitioner allegedly gave to co-defendant Edwards. Trial counsel attempted to impeach co-defendant Edwards, who admitted that he had a prior criminal history. Trial counsel discussed the State's discovery with Petitioner in detail and explained the State's case against him. Trial counsel agreed that he did not examine the actual marked bills used as buy money. Trial counsel identified several letters that he had previously written to the Board of Professional Responsibility in response to several of Petitioner's complaints in 2007 and 2008. However, trial counsel again stated that he did not recall that Petitioner asked him to withdraw from either of the current cases.

*Case number 2011-D-3013*

Petitioner testified that he informed trial counsel that Ms. Jenkins was not a credible witness. Petitioner noted that, on cross-examination, Ms. Jenkins testified that she had not received a plea offer from the State in exchange for her testimony against Petitioner. However, Petitioner later learned that Ms. Jenkins received a sentence of ten years. Petitioner also asserted that trial counsel failed to investigate a potential witness named Tabitha.[2] Petitioner informed trial counsel that he "left the club, went to the

---

[2] Tabitha's last name is not included in the record.

- 19 -

Waffle House, then stopped by [Tabitha's] house[,]" but trial counsel did not verify this information.

Petitioner stated that he wanted trial counsel to show the video surveillance from the Out of Bounds club from the night of the offenses to the jury. Petitioner received the video in discovery, but trial counsel informed him that the video was not admissible unless Petitioner testified at trial. The video only depicts the interior of the club. Petitioner asked trial counsel to investigate if the club had any video surveillance of the parking lot, but trial counsel said it was not available. Petitioner wanted trial counsel to cross-examine Ms. Jenkins about the fact that she called Petitioner to purchase drugs. However, in a jury-out hearing, the trial court ruled that the testimony was inadmissible.

Petitioner claimed that he went to a Waffle House restaurant and ordered food after he left the club on the night of the offenses. While he was eating, he observed "a whole bunch of police cars flying up Murfreesboro Road toward the club." Trial counsel did not attempt to preserve any surveillance footage from the Waffle House that Petitioner visited on the night of the offenses and did not investigate the employee records of the Waffle House to find an employee who could corroborate the fact that Petitioner ate at that location on the night of the offenses. Petitioner also asserted that trial counsel failed to obtain transcripts of interviews of witnesses, including Ms. Jenkins. Petitioner asserted that he was prejudiced by trial counsel's failure to obtain the transcript of Ms. Jenkins' interview because she gave inconsistent statements, and trial counsel was unable to effectively cross-examine her regarding her role in the robbery and murder and her plea agreement with the State. Petitioner also stated that he wanted trial counsel to hire an expert on "phone records and phone towers" because the State offered testimony regarding Petitioner's location based on cell phone "pings." Trial counsel did not retain such an expert.

On cross-examination, Petitioner asserted that Tabitha's testimony would have been beneficial for his case because the witnesses to the offenses described an offender whose appearance and demeanor differed from Petitioner's. Petitioner also argued that the surveillance video from the club would have "cleared [his] name" because Petitioner's appearance in the club differed from the description of the offender that witnesses gave to law enforcement. On redirect examination, Petitioner explained that he wanted trial counsel to seek the admission of the surveillance video from inside the club because the video depicted an argument between the victim and some other individuals. Trial counsel did not investigate who these other individuals might have been.

Trial counsel testified that he met with Petitioner numerous times during his representation of Petitioner for this case and viewed the surveillance video from the club. He also hired an investigator to assist with the case. Trial counsel testified that he did not

seek to admit the surveillance video from the interior of the club because the video does not depict Petitioner during the altercation between the victim and other individuals. Regardless, the State played the video at trial.

Trial counsel testified that Petitioner never asked him or his investigator to investigate an alibi witness. Trial counsel stated that, if he had been aware of a Waffle House employee that could have been an alibi for Petitioner, he would have investigated the witness. Trial counsel recalled that Petitioner "mentioned a girl whose house he was at before he went there and he put on the orange shirt, and this girl . . . would have testified that when he left her house he had on an orange shirt." Trial counsel noted that Ms. Jenkins testified at trial that Petitioner was wearing an orange shirt, so he "didn't see any point in trying to call" the witness.

Trial counsel stated that calling an expert on cell phone towers would not have benefitted Petitioner's case because the expert would have testified similarly to the State's expert. Regarding the transcript of Ms. Jenkins' interview, trial counsel stated that he obtained the police report so he was aware of the substance of her trial testimony. Trial counsel noted that he also had the audio recording of Ms. Jenkins' statement. Trial counsel testified that he did not cross-examine Ms. Jenkins' about inconsistent statements because "[s]he testified essentially at trial to what [was] in her statement[.]"

On cross-examination, trial counsel agreed that, at trial, he did not argue that Ms. Jenkins contacted Petitioner to purchase drugs. Trial counsel went to the club to examine the crime scene, and his investigator went to the law office where the robbery and murder occurred to determine whether the law office had surveillance video of the offenses.

Shannon Burroughs testified that, in May 2011, he worked as a cook at Waffle House. Mr. Burroughs knew Petitioner as a regular customer at Waffle House. Mr. Burroughs recalled that, on one occasion, Petitioner came to the restaurant early in the morning and ordered his usual food order. He recalled speaking to one of the servers and Petitioner about police driving down Murfreesboro Road. On cross-examination, Mr. Burroughs clarified that he remembered this interaction with Petitioner as occurring "[b]ack in 2011" but that he could not remember the date or the exact time that Petitioner came into the Waffle House.

Roger Clemons testified that he assisted trial counsel with investigating Petitioner's case. He agreed that he met with Petitioner three times while Petitioner was incarcerated prior to trial. Mr. Clemons stated that, if a client alleged that they had an alibi for the time of the offense, he would "make every effort" to contact the alibi witness. He did not recall that Petitioner mentioned an alibi witness. Mr. Clemons acknowledged that his file on his investigation for Petitioner's case had been destroyed

by arson. Mr. Clemons stated that, if Petitioner had informed him that he was eating at Waffle House when the offenses occurred, he would have "asked [Petitioner] if he knew the names of those individuals, what their positions were, whether they were a server, or a cook, or a manager, and [Mr. Clemons] would have gone to the location and tried to speak with them[.]" Mr. Clemons did not investigate any Waffle House employees for Petitioner's case. On cross-examination, Mr. Clemons recalled that trial counsel asked him to visit the law office where the robbery and murder occurred to "check for the lighting at night" and to speak with employees at the law office "to find out if they had any operational cameras or any witnesses that might have known anything about it."

In an order filed on December 4, 2017, the post-conviction court denied relief. The post-conviction court found that "[t]rial counsel was not told about a possible alibi prior to the murder trial. He was told about a potential witness who could identify what Petitioner had been wearing that night." The post-conviction court also found that Petitioner "was in that Waffle House at some point on the night of May 6, 2011." The post-conviction court concluded that "[t]here was no evidence presented that these missing alibi witnesses' testimony would have affected the outcome of this case." Regarding the surveillance video from the club, the post-conviction court noted that "the shooting took place in the parking lot of the law office next door" and that trial counsel "asked the investigator to ask the law office if they had a camera in their parking lot." Thus, the post-conviction court concluded that "[t]here was no evidence presented that videotaped evidence of the area of the shooting ever existed in the first place." The post-conviction court found that Petitioner "stated no legal basis" for his argument that trial counsel should have tried to suppress Petitioner's cell phone records. The post-conviction court also found that trial counsel "did not file a motion to suppress the phone records as he did not see any legal basis for that motion." The post-conviction court concluded that this issue had no merit.

Regarding trial counsel's failure to obtain an expert on cell phone location data, the post-conviction court found that Petitioner "offered no evidence to support a finding of deficiency or how the outcome of this case would have been different had an expert been used." The post-conviction court found that trial counsel "warned Petitioner that his codefendant may testify against him, and . . . he did not seek a continuance because he did not feel it was needed." The post-conviction court also found that trial counsel reviewed Ms. Jenkins' prior statements and "felt . . . prepared to cross[-]examine her at trial." The post-conviction court concluded that trial counsel was not deficient in his cross-examination of co-defendant Edwards or Ms. Jenkins.

Petitioner now timely appeals the post-conviction court's denial of relief.

## II. Analysis

In order to prevail on a petition for post-conviction relief, a petitioner must prove all factual allegations by clear and convincing evidence. *Jaco v. State*, 120 S.W.3d 828, 830 (Tenn. 2003). Post-conviction relief cases often present mixed questions of law and fact. *See Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Appellate courts are bound by the post-conviction court's factual findings unless the evidence preponderates against such findings. *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). When reviewing the post-conviction court's factual findings, this court does not reweigh the evidence or substitute its own inferences for those drawn by the post-conviction court. *Id.*; *Fields*, 40 S.W.3d at 456 (citing *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997)). Additionally, "questions concerning the credibility of the witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the [post-conviction court]." *Fields*, 40 S.W.3d at 456 (citing *Henley*, 960 S.W.2d at 579); *see also Kendrick*, 454 S.W.3d at 457. The trial court's conclusions of law and application of the law to factual findings are reviewed de novo with no presumption of correctness. *Kendrick*, 454 S.W.3d at 457.

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. In order to receive post-conviction relief for ineffective assistance of counsel, a petitioner must prove: (1) that counsel's performance was deficient; and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (stating that the same standard for ineffective assistance of counsel applies in both federal and Tennessee cases). Both factors must be proven in order for the court to grant post-conviction relief. *Strickland*, 466 U.S. at 687; *Henley*, 960 S.W.2d at 580; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). Additionally, review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley*, 960 S.W.2d at 579. We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006).

As to the first prong of the *Strickland* analysis, "counsel's performance is effective if the advice given or the services rendered are within the range of competence demanded of attorneys in criminal cases." *Henley*, 960 S.W.2d at 579 (citing *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)); *see also Goad*, 938 S.W.2d at 369. In order to prove that

counsel was deficient, the petitioner must demonstrate "that counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688); *see also Baxter*, 523 S.W.2d at 936.

Even if counsel's performance is deficient, the deficiency must have resulted in prejudice to the defense. *Goad*, 938 S.W.2d at 370. Therefore, under the second prong of the *Strickland* analysis, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694) (internal quotation marks omitted).

### *Failure to call alibi witness*

Petitioner asserts that, in case number 2011-D-3013, trial counsel failed to call Mr. Burroughs to testify at trial as an alibi witness. Petitioner contends that Mr. Burroughs would have been a "material" witness at trial. The State argues that trial counsel conducted a reasonable investigation and was unaware of Mr. Burroughs' potential as an alibi witness. The State also argues that Mr. Burroughs' testimony would not have affected the outcome of Petitioner's trial because his testimony was "a non-specific and nebulous recollection[.]"

At the post-conviction hearing, trial counsel testified that Petitioner never asked him or his investigator to investigate an alibi witness. Trial counsel stated that, if he had been aware of a Waffle House employee that could have been an alibi for Petitioner, he would have investigated the witness. Mr. Burroughs testified that he worked as a cook at Waffle House and knew Petitioner as a regular customer. Mr. Burroughs recalled that, on one occasion, Petitioner came to the restaurant early in the morning and ordered his usual food order. He recalled speaking to one of the servers and Petitioner about police driving down Murfreesboro Road. On cross-examination, Mr. Burroughs clarified that he remembered this interaction with Petitioner as occurring "[b]ack in 2011" but that he could not remember the date or the exact time that Petitioner came into the Waffle House. The post-conviction court found that "[t]rial counsel was not told about a possible alibi prior to the murder trial. He was told about a potential witness who could identify what Petitioner had been wearing that night." The post-conviction court also found that Petitioner "was in that Waffle House at some point on the night of May 6, 2011." The post-conviction court concluded that "[t]here was no evidence presented that these missing alibi witnesses' testimony would have affected the outcome of this case."

We agree with the post-conviction court that Petitioner has not established that he was prejudiced by trial counsel's failure to discover and interview Mr. Burroughs. Mr. Burroughs remembered serving Petitioner at Waffle House while the police drove past, but he could not remember the exact date of that event. Based on his testimony at the post-conviction hearing, Mr. Burroughs would not have been able to provide a solid alibi for Petitioner. Petitioner is not entitled to relief on this ground.

### *Failure to properly investigate*

Trial counsel has a duty to "conduct appropriate investigations, both factual and legal, to determine what matters of defense can be developed." *Baxter*, 523 S.W.2d at 933. "[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691; *see also State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999). However, "when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland*, 466 U.S. at 691.

### *Case number 2011-B-1648*

Petitioner contends that trial counsel was deficient for failing to request a continuance and investigate Mr. Edwards after trial counsel and Petitioner learned that Mr. Edwards would be testifying at trial. Petitioner also asserts that "trial counsel was unfamiliar [with] discovery provided by the State, specifically as counsel failed to file a single pre[-]trial motion specifically a motion to suppress [Petitioner]'s telephone records which were acquired without a search warrant."

"If a petitioner alleges that trial counsel rendered ineffective assistance of counsel by failing to . . . file a motion to suppress . . . the petitioner is generally obliged to present the witness or the other evidence at the post-conviction hearing in order to satisfy the *Strickland* prejudice prong." *Demarcus Sanders v. State*, No. W2012-01685-CCA-R3-PC, 2013 WL 6021415, at *4 (Tenn. Crim. App. Nov. 8, 2013) (citing *Pylant v. State*, 263 S.W.3d 854, 869 (Tenn. 2008)), *perm. app. denied* (Tenn. Mar. 17, 2014).

Petitioner testified that, if the trial court had granted a continuance, he would have been able to give trial counsel his version of what occurred in the holding cell. Trial counsel had previously discussed the possibility that co-defendant Edwards might become a State witness with Petitioner. Trial counsel stated that he did not ask the trial court for a continuance after learning that co-defendant Edwards was going to testify for

the State because he "[d]idn't see any reason for one." The post-conviction court found that trial counsel "warned Petitioner that his codefendant may testify against him, and . . . he did not seek a continuance because he did not feel it was needed."

Regarding the motion to suppress, trial counsel explained that he did not file a motion to suppress Detective Smith's statement about co-defendant Edwards' phone calling Petitioner's phone because he did not have any legal basis for suppression. The post-conviction court found that Petitioner "stated no legal basis" for his argument that trial counsel should have tried to suppress Petitioner's cell phone records. The post-conviction court also found that trial counsel "did not file a motion to suppress the phone records as he did not see any legal basis for that motion."

We conclude that trial counsel's performance was not deficient for failing to request a continuance after learning that Mr. Edwards was going to testify at Petitioner's trial in case number 2011-B-1648. As noted above, we will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson*, 197 S.W.3d 790. Trial counsel made a reasonable trial decision to not file a motion for a continuance because he did not believe that the motion was meritorious. We will not second-guess this decision, and Petitioner is not entitled to relief on this ground. We also conclude that trial counsel's performance was not deficient for failing to file a motion to suppress Petitioner's phone records. Trial counsel made a tactical decision to not file a motion to suppress because the motion had no legal basis. As the post-conviction court noted, Petitioner failed to present a legal basis under which trial counsel could have filed the motion. Petitioner is also not entitled to relief under this ground.

*Case number 2011-D-3013*

Petitioner contends that trial counsel's investigation in this case was deficient because trial counsel "failed to present obvious and pertinent theories of defense." More specifically, Petitioner asserts that he was prejudiced by trial counsel's failure to investigate Tabitha, "who could have testified to [Petitioner]'s demeanor shortly after the time frame of the crime, his appearance, and his physical features at the time of the incident." Additionally, Petitioner contends that he was prejudiced by trial counsel's failure to investigate the video surveillance from the club and introduce the footage at trial. He argues that trial counsel should have identified "individuals" who could have been used to "cast doubt upon the State's theory of the case."

The State notes that Tabitha did not testify at the post-conviction hearing, and thus, Petitioner cannot establish prejudice. Further, the State asserts that evidence of the robbery and murder at the club "was already before the jury by virtue of Ms. Jenkins'

testimony." Thus, the State contends that "[t]rial counsel examined the video and made the strategic decision that it was unnecessary to seek its introduction at trial because Petitioner was not in the video and the altercation was not clearly shown."

Petitioner asserted that Tabitha's testimony would have been beneficial for his case because the witnesses to the offenses described an offender whose appearance and demeanor differed from Petitioner's. Petitioner also argued that the surveillance video from the club would have "cleared [his] name" because Petitioner's appearance in the club differed from the description of the offender that witnesses gave to law enforcement. Trial counsel recalled that Petitioner "mentioned a girl whose house he was at before he went there and he put on the orange shirt, and this girl . . . would have testified that when he left her house he had on an orange shirt." Trial counsel testified that he did not seek to admit the surveillance video from the interior of the club because he "didn't see any point in it" because the video does not depict Petitioner during the altercation between the victim and other individuals. However, the State played the video at trial. Regarding the surveillance video from the club, the post-conviction court noted that "the shooting took place in the parking lot of the law office next door" and that trial counsel "asked the investigator to ask the law office if they had a camera in their parking lot." Thus, the post-conviction court concluded that "[t]here was no evidence presented that videotaped evidence of the area of the shooting ever existed in the first place."

We conclude that Petitioner has not established that he was prejudiced by trial counsel's failure to investigate Tabitha. In cases where a petitioner contends that trial counsel failed to present a witness in support of the petitioner's defense, the petitioner must present such witness at the post-conviction hearing. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). Neither a trial nor an appellate judge can speculate as to whether that witness's testimony would have been favorable to the defense. *Id.* Therefore, the petitioner must "produce a material witness who . . . would have testified favorably in support of his defense if called [at trial]. Otherwise, the petitioner fails to establish the prejudice requirement mandated by *Strickland v. Washington*." *Id.* at 758. Petitioner did not call Tabitha to testify at the post-conviction hearing, so we cannot speculate as to whether Tabitha's testimony would have been favorable to Petitioner. He is not entitled to relief on this ground.

We also conclude that Petitioner has not established that he was prejudiced by trial counsel's failure to investigate the video surveillance from the club and introduce the footage at trial. As trial counsel noted, the State presented the video surveillance from the interior of the club to the jury. We agree with the post-conviction court that there was no evidence that a surveillance video of the law office parking lot ever existed. Thus, Petitioner cannot establish that any further investigation would have affected the result of his trial. He is not entitled to relief on this issue.

*Failure to effectively cross-examine Ms. Jenkins and object to trial court's ruling*

Petitioner asserts that trial counsel failed to effectively argue that Ms. Jenkins phone call with Petitioner referred to a drug transaction, not the robbery and murder. He argues that "[b]y failing to object to the Court's instructions to the witness to not reference drugs, [trial counsel] in essence denied [Petitioner] a full and fair cross-examination of the witness[.]" The State contends that "[n]othing in the record supports Petitioner's assertion that Ms. Jenkins only mentioned coordinating a robbery with Petitioner after she was not allowed to testify about a drug buy." The State also notes that Petitioner has not identified a legal basis under which trial counsel could have objected to the trial court's ruling.

Trial counsel stated that he obtained the police report and the audio recording of Ms. Jenkins' statement, so he was aware of the substance of Ms. Jenkins' trial testimony. Trial counsel testified that he did not cross-examine Ms. Jenkins' about her inconsistent statements because "[s]he testified essentially at trial to what [was] in her statement[.]" Trial counsel agreed that he did not argue that Ms. Jenkins contacted Petitioner to purchase drugs. The post-conviction court found that trial counsel reviewed Ms. Jenkins' prior statements and "felt . . . prepared to cross[-]examine her at trial." The post-conviction court concluded that trial counsel was not deficient in his cross-examination of Ms. Jenkins.

We agree with the post-conviction court that trial counsel's cross-examination of Ms. Jenkins was not deficient. As the State notes, Petitioner has not identified a legal basis for objecting to the trial court's ruling that limited Ms. Jenkins' testimony. Even if trial counsel had objected to the trial court's ruling and the trial court had issued a new ruling, it is unlikely that Ms. Jenkins' testimony would have altered the result of Petitioner's trial. At trial, Ms. Jenkins testified that she saw Petitioner point a gun at the victim, and she heard gunshots. Providing an alternative theory for the phone call exchange between Petitioner and Ms. Jenkins would not have negated the impact of this testimony. Thus, we conclude that Petitioner is not entitled to relief on this ground.

*Failure to withdraw as counsel*

Lastly, Petitioner argues that he asked trial counsel to withdraw from his cases because trial counsel had previously represented Petitioner on a drug case and Petitioner felt that he could not trust trial counsel. The State notes that Petitioner failed to raise this ground in his post-conviction petitions and has thus waived this ground of relief.

It is a well-established rule that this court will not address post-conviction issues that were not raised in the petition or addressed by the post-conviction court. *Brown v. State*, 928 S.W.2d 453, 457 (Tenn. Crim. App. 1996); *State v. Smith*, 814 S.W.2d 45, 49 (Tenn. 1991). Because Petitioner did not include this issue in either of his post-conviction petitions, we conclude the issue is waived.

### III. Conclusion

After a thorough review of the facts and applicable case law, we affirm the post-conviction court's denial of relief.

_____
ROBERT L. HOLLOWAY, JR., JUDGE